# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                                       **Case No. 8:07-cr-99-T-23TBM**

**JORGE ARMANDO LIZARRAGA-CACERES,
ELEAZAR CAMACHO MALDONADO,
ROBERTO GOVEO-ZARAGOZA, and
FRANCISCO PAUL VALDEZ-GONZALEZ,**

        **Defendants.**

_____/

## REPORT AND RECOMMENDATION

      THIS MATTER is before the court on referral by the Honorable Steven D. Merryday

for a Report and Recommendation on the following motions:

    1)      Jorge Armando Lizarraga-Caceres's **Motion to Suppress Statements and for Evidentiary Hearing** (Doc. 73) and the government's response (Doc. 87);

    2)      Eleazar Camacho Maldonado's **Motion to Suppress Statements and for Evidentiary Hearing** (Doc. 81) and the government's response (Doc. 88);

    3)      Roberto Goveo-Zaragoza's **Emergency Motion to Suppress Statements and for Evidentiary Hearing** (Doc. 89) and the government's response (Doc. 107); and

    4)      Francisco Paul Valdez-Gonzalez's **Motion to Suppress and Request for Evidentiary Hearing** (Doc. 103) and the government's response (Doc. 108).

An evidentiary hearing on the motions of Lizarraga-Caceres and Camacho Maldonado was

conducted on May 30, 2007.  An evidentiary hearing on the motions of Goveo-Zaragoza and

Valdez-Gonzalez was conducted June 6, 2007.

By these motions, each Defendant argues that post-arrest statements should be suppressed on the following grounds:  1) the statements were taken in violation of each Defendants' rights under Miranda v. Arizona, 384 U.S. 436 (1966); 2) the waiver of rights was not made voluntarily; and 3) the statements were taken in violation of Rule 5 of the Federal Rules of Criminal Procedure and County of Riverside  v. McLaughlin, 500 U.S. 44 (1991).

In response to the motions, the government notes that the Defendants were among eleven Mexican and three Panamanian crewmen arrested after the vessel they were on was boarded by the U.S. Coast Guard off the Pacific coast of Panama and found to contain approximately nineteen tons of cocaine.  It maintains that these crewmen were not interrogated until their arrival in Tampa, Florida, and only after being duly advised of the Miranda warnings.  As for the alleged Rule 5 argument, the government denies there was unnecessary delay in bringing the Defendants before the court under the circumstances that exist here.  Further, it asserts that any claims of Fourth Amendment violations are without merit because the Defendants were foreign nationals in international waters and not protected by the Fourth Amendment to the Constitution.  In any event, the government notes that a probable cause finding, as represented by the grand jury Indictment in this case, was made on March 22, 2007, prior to the Defendants' arrival in the United States.

## I.

By way of background, each of these Defendants was a crew member on the M/V Gatun, a Panamanian flagged commercial freighter boarded by the United States Coast Guard on March 17, 2007, while traveling in the eastern Pacific.  A subsequent search of closed

containers on the vessel revealed more than nineteen tons of cocaine.  As a consequence, the Defendants were arrested and ultimately flown to Tampa, Florida, for prosecution.  They arrived on the evening of March 22, 2007.  They all were taken to the local DEA office where they were interviewed.  They all first appeared before a magistrate judge on March 23, 2007, and were provided court appointed counsel.[1]

At the outset of the hearing on the motions of Camacho Maldonado and Lizarraga-Caceres, the prosecutor indicated that he was unaware of any statements taken as a result of any interrogation of these Defendants prior to their arrival in Tampa.  Thus, the focus of the hearing was on the statements taken on the evening of March 22, 2007.

## A.

As the evidence pertains to Camacho Maldonado, the government presented testimony from Manuel Almaguer, a Drug Enforcement Agency ("DEA") agent with ten years experience, six of which were with the Panama Express task force.  Almaguer is Mexican born and speaks Spanish as his first language.  He testified that on March 22, 2007, at about 8:00 p.m., he was at the DEA office to process and interview prisoners that had recently arrived from Panama.  The prisoners arrived at the airport at about 8:00 p.m. and were brought to the local DEA office.  He processed and interviewed two individuals, including Camacho Maldonado.  He was assisted by Greg Ravencroft, a special agent with Immigration and Customs Enforcement ("ICE").  According to Almaguer, Ravencroft speaks "limited" Spanish.  Camacho Maldonado was taken to a small interview room where he was initially asked booking and biographical information.  Camacho Maldonado appeared to have

---

[1]Of the crewman, only the Mexican nationals were transported to the United States. The Panamanian crewmen were released to Panamanian authorities.

3

no difficulty understanding or responding to the questions.  As for the interrogation, Almaguer indicates that Ravencroft read an advisement of rights form to Camacho Maldonado in Spanish.  <u>See</u> Govt. Exh. 1 (Camacho Maldonado).  According to Almaguer, each of the rights on the form was read to the Defendant in Spanish and the Defendant placed his initials next to the corresponding line on the form.  As the witness described the form, it advised the Defendant of his right to remain silent, that anything he said could be used against him in a court of law, that before being questioned he had the right to consult an attorney, that he had the right to an attorney present during the interview, and if he could not pay for an attorney, if he wished, the court would assign him an attorney before having him answer any questions.  According to the witness, Camacho Maldonado understood these rights and agreed to answer the questions, as indicated by an "X" he placed on the waiver of rights form.  This advisement process took twenty minutes to complete.

According to the witness, the Defendant never asked for an attorney and at no time indicated that he did not wish to answer the agent's questions.  The interview lasted approximately thirty minutes and was terminated by the agent.

On cross examination, the witness was asked to translate verbatim the fifth line of rights.  By his translation, the form said that "if you cannot pay for services of an attorney, if you wish so, there will be an assigned one to you before you have to answer questions."  The agent agreed that nowhere did the form advise the individual that such attorney would be "without costs" to him.  Neither did the form expressly indicate that the attorney provided would be a "defense" attorney.  Almaguer agreed with defense counsel that individuals brought to the United States for prosecution in these cases typically are foreign nationals with no knowledge of American laws or their rights under such, and that the subjects are typically

4

scared.  According to the agent, that is why he ad libs on these rights in order to better explain them to the individuals.

The witness believed that Ravencroft was sufficiently fluent in Spanish to read these rights to the Defendants.  If the Defendant indicates he does not understand something, it is Almaguer's practice to attempt to explain the matter.  Here, he could not recall the Defendant asking any questions.  After the advisement of rights form was read to Camacho Maldonado, he was allowed to read it himself and he then signed it.  Almaguer testified that it is his practice in addressing such persons to advise them that the laws in the United States are different, they all have rights and are equal under the law, and that everyone will get an attorney.  He usually adds, and did so in this case, that it is to the benefit of the individual that he cooperates with the government and tells them what happened that led to the arrest.  This is done before the rights form is read to the person.

On redirect, the witness testified that Ravencroft read the <u>Miranda</u> form correctly and that the Defendant gave no indication of not understanding the form.  The witness described Camacho Maldonado's Spanish as "proper," not "slang."  In response to the court's question, Almaguer testified that the DEA-13 form in this case differs somewhat from the form used by the Federal Bureau of Investigation ("FBI") and ICE.  When asked by the court to translate the actual rights as stated on the form rather than his ad lib, the witness testified that the form advised: "You have the right to remain silent.  Whatever you say can be used against you in court.  Before asking you any questions, you have the right to consult an attorney.  You have the right to have an attorney present during [ ] the interrogation.  If you cannot pay for services of an attorney, and if you wish, an attorney will be assigned before [ ] any questions are asked."  The witness testified further that he explains to these individuals

the nature of the Panama Express operation, the number of seizures that have been made, and that it is no accident that they found their vessel in the vast ocean.  He also adds that it is in their best interest to talk to him.

Camacho Maldonado did not testify or call any witnesses.

B.

Regarding Lizarraga-Caceres, the government called Fundy Caraballo, an FBI intelligence analyst assigned to the Panama Express investigation.  According to the witness, he has fifteen months with the FBI and formerly was with the Puerto Rican Navy for twenty-four years.  His primary language is Spanish.  On March 22, 2007, he was at the DEA office for purposes of processing and interviewing.  One of the two persons he dealt with was Lizarraga-Caceres.  By this witness's account, he and ICE agent Jeremy Beal escorted the Defendant to an interview room.  Agent Beal does not speak Spanish, so Caraballo conducted the interview.  By his testimony, they engaged in "chit chat" at the outset.  Caraballo had no difficulty speaking to the Defendant and the Defendant evidenced no difficulty in understanding him.  The Defendant was responsive and logical in his conversation, his demeanor was appropriate to the circumstances, and on occasion the Defendant got slightly emotional about what was happening.

The witness also used the Spanish version of the rights advisement form.  See Gov't Exh. 1 ( Lizarraga).  He read the rights to Lizarraga-Caceres and then had him read the form himself and sign it.  According to Caraballo, the advisement process took only five minutes.  After he read the rights to Lizarraga-Caceres, Caraballo handed the form to the Defendant who read it, initialed each of the rights, and then signed the form agreeing to talk to the agent.  The Defendant asked no questions and evidenced no indication that he did not understand the

6

rights or the waiver.  According to Caraballo, the interview lasted for slightly more than one hour, finishing sometime after 1:00 a.m.  At no time during the interview did the Defendant ask for an attorney or indicate that he did not wish to answer a question, and he did not refuse to answer any questions.

On cross examination, Caraballo agreed that the Spanish spoken in Puerto Rico is slightly different from Spanish spoken in South America.  Before joining the FBI, the witness had no prior experience in drug interdiction cases and his training has been "on the job."  He has only conducted about nine interviews in Panama Express cases.  According to the witness, his goal in conducting interviews is to obtain a factual statement and the truth from the defendant.  Caraballo denied that he advised Lizarraga-Caceres that he was facing life in prison.  He acknowledged, however, that he advised Lizarraga-Caceres that those who cooperate are able to get better deals in the sense that he will tell the prosecutor of the information provided and this will be viewed as a positive step.  Although the witness could not recall his exact words, he suggested to the Defendant that he possibly might be looking at a better deal if he cooperated.  He also advised the Defendant that the information would not be shared with foreign countries.  This was all done before the form was presented to Lizarraga-Caceres.

The witness testified that the Defendant was from Mexico and appeared to have no understanding of American law.  Caraballo read the form to the Defendant but did not explain it to him.  The form does not say that the person does not have to pay for an attorney, but it does suggest that if he could not pay for the services of a lawyer and if he wished one, one would be given before any questions.  The witness denied that Agent Beal became angry with

the Defendant, but he acknowledged that they challenged some of the Defendant's statements that they did not believe to be true.

Caraballo did not offer the Defendant food or water and had no knowledge whether the Defendant was sleepy.  The statement was not recorded and the only record is that set forth by Agent Beal in a DEA-6 form.

Defendant Lizarraga-Caceres testified next.  He is a citizen of Mexico.  On March 22, 2007, he was interviewed after being flown to Tampa from Panama.  He testified that he arrived at the DEA office at approximately 9:00 p.m.  His clothes were taken from him and he was given cloth overalls and was fingerprinted.  Lizarraga-Caceres testified that he and the others were detained on March 17, 2007, at about 9:00 p.m.  They were tied to the deck of the boat where they were exposed to the weather.  As a consequence, he was unable to sleep and did not actually get sleep until he was placed at Orient Road jail.  By his testimony, he was given a sandwich on the plane from Panama but had not had other food or drink since.  When he asked for water during the interview, he claims the agents told him he would get some after the interview although this did not occur.

After waiting for about one and one-half hours, he was taken to an interview room where the agents read a paper to him.  He indicated that the English-speaking agent became upset with him during the interview and spoke to him in a loud voice.  This was translated by Caraballo who said he had to cooperate with them and insisted the correct version of what happened was theirs (the agents) and not the one that Lizarrago-Caceres was giving them.  Lizarrago-Caceres testified that before he signed the paper (waiver form), he was told by the agent that if he made a statement and cooperated he would able to be free soon.  He stated that the agents told him they had seized a significant amount of drugs, they were all guilty,

and that he would be put away for twenty years.  They also asked if he did not love his family.

Lizarraga-Caceres acknowledged signing the rights advisement and waiver form.  He indicated that he had asked to call his family because he was scared.  He further indicated he was unfamiliar with American law.  According to the Defendant, after he asked to make a phone call, he was told by the agents that he would get a lawyer after a hearing in court and the lawyer could call his family.  By Lizarraga-Caceres's testimony, the agents never told him he could have an attorney without having to pay for it or without cost to him.  He indicated that he would have liked to have an attorney with him but did not know that he had the right to have an attorney without cost to him.

Lizarraga-Caceres acknowledged that he can read Spanish.  When asked if he read and understood the form, he did not specifically answer.  He indicated, however, that he signed the form because the agent said that if he cooperated, the process would be simpler and he would return home sooner.  He was told that because of the amount of drugs seized from the vessel, he would get more than twenty years in jail.  By his account, he suggests that he only signed the form because he believed that doing so would make his situation better.

After the interviews, when the crew was again assembled in one room, they were told they could call the consulate and a phone was provided.

On cross examination, Lizarraga-Caceres admitted he had read and signed the form.  He acknowledged that he told the agents that he was afraid for his family in Mexico, given the drug allegations.  He indicated that the agents insisted that the drugs had been brought on board by "go-fast" boats even though Lizarraga-Caceres insisted he knew nothing about the drugs.  He acknowledged that he prefaced his responses with his concerns for his family in Mexico.  The agents asked if he was fearful for his family and was told that if he cooperated

9

they could be brought to the United States and nothing would happen to them.  He insisted

that he told the agents he had nothing to do with the drugs but they continued to get upset

with him.

Finally, Lizarraga-Caceres called Pedro Marino, a certified federal interpreter with

nine years experience in the Middle District of Florida.  Marino was asked to translate the

language in the DEA-13 form used with Lizarraga-Caceres.  In pertinent part, the witness

indicated that the form stated:

> Before asking you any questions you have to understand
> your rights.  You have the right to remain silent.  Anything
> you say can be used against you in the tribunal.  Before
> asking you any questions, you have the right to consult an
> attorney.  You have the right to have an attorney present
> during the interrogation.  If you cannot pay for the services
> of an attorney and you wish, one would be appointed before
> asking you any questions.  Have you understood your rights?
> Are you willing to answer some questions?
>
> Waiver of Rights. I have read [or] it has been read to me, the
> above mentioned rights.  I understand what my rights are.  At
> this moment, I am willing to answer freely and voluntarily
> any questions without the presence of an attorney.

The witness further indicated that the form did not state that an attorney would be appointed

"without cost."  On cross examination, the witness acknowledged that the form did say that if

the person could not pay for an attorney, one would be provided.

## C.

Regarding Goveo-Zaragoza, Eric Holm, an agent with the United States Coast Guard

Investigative Services, testified that he interviewed Goveo-Zaragoza on March 23, 2007.[2]

---

[2]At the outset of the hearing on June 6, 2007, the prosecutor again indicated that he
was unaware of any statements taken as a result of interrogations of either Goveo-Zaragoza or
Valdez-Gonzalez.  There were conversations with Valdez-Gonzalez, who identified himself
as captain of the vessel.  According to the government, there was no effort to interrogate him

Holm has sixteen years experience with the Coast Guard, including five and one-half years as a Special Agent and two years working on Panama Express investigations. He speaks Spanish as a second language. He developed his language skills while working with the Coast Guard wherein Spanish was used as his primary language. He testified that he is "fully fluent" in Spanish and has conducted investigations and interviews using a variety of dialects, including Mexican, during his Coast Guard experience.

Holm employed Gov't Exh. 1 (Zaragoza) to advise the Defendant of his <u>Miranda</u> rights in Spanish. The interview began at approximately 9:40 p.m. in a small interview room at the DEA office in Tampa, Florida. Holm was assisted by Special Agent Jeff Adams of ICE. By Holm's description, Adams has a good understanding of Spanish but speaks very little Spanish, so Holm conducted the interview. At the outset, Holm asked the Defendant how he was feeling and whether he needed to use the restroom. He next reviewed biographical information with the Defendant and then indicated that he wished to speak with the Defendant but needed to advise him of his rights first. According to Holm, the Defendant indicated that he was feeling fine, and by Holm's observation, Defendant was lucid, aware, physically well, and his responses were appropriate.

Holm placed the rights advisement form in a position where the Defendant could read it and he then invited the Defendant to read along with him. By his account, Holm read each line of the rights form and then paused to looked up at the Defendant in case there were any questions. The witness believes the Defendant read along with him and that the Defendant understood the rights because he did not look puzzled or ask any questions about

---

beyond the matters associated with the boarding and post-boarding inquiry. Thus, at present, the motions address only those statements taken after the Defendants' arrival in Tampa, Florida.

the rights.  After reading the waiver portion of the form to the Defendant, Goveo-Zaragoza agreed to talk and signed the form.  The advisement process took only two to three minutes to complete.  The only question Holm recalled the Defendant asking was whether he would still have the right to an attorney if he waived one at that time but wanted one later.[3]  Holm advised that he would and claims he told the Defendant that he could cease the interview at any time if he chose.

At no time did the Defendant ask for an attorney.  At no time did the Defendant ask for the questions to stop.  When asked at the conclusion of the interview how he felt, the Defendant again indicated that he felt fine.

On cross examination, the witness indicated that he had conducted at least thirty to forty interviews using a rights advisement form, although this was the first time he had used this particular form (the DEA-13 form).  Holm indicated that he had personal experience in these interdictions and agreed with counsel that a delay of five to seven days to get those arrested to Tampa, Florida, would not be unusual.  Nevertheless, Holm did not ask the Defendant if he would like to postpone the interview until a later time or if he had any sleep, and he did not offer the Defendant any food.  Holm could not recall whether he brought water or drinks to the Defendant but he would have if the Defendant had asked.  Although the agent wore a firearm, he indicated it would not have been visible to the Defendant since it was strapped to his ankle.

Specifically regarding the rights form, Holm reiterated that he would have read from the form line by line and he likely elaborated on each line.  He agreed with counsel that the

---

[3]Holm was not entirely certain that it was this Defendant who asked this question, but he believes it was.

form did not advise the Defendant of the right to a "free" lawyer, although the witness believed such was suggested. The witness further agreed that the form did not specifically indicate "at no cost." Holm was unaware of the Defendant's education or his knowledge of U.S. law and made no inquiry into such matters.

Holm himself checked both boxes in the waiver section of this form indicating that the Defendant had read the form and had it read to him because the witness believed that to be the case.

The witness was unaware of the conditions in which these Defendants were held during their transport to Tampa. By his past experience, such individuals were not allowed a berth on either the Coast Guard or naval transport vessels and usually were held on deck or in a location such as a helicopter hangar on a deck of the ship.

In response to questions by the court, Holm indicated that he typically would tell the person being interviewed that he already had one side of the story and would like to have the other side of the story as well. In this case, he does not recall mentioning anything related to cooperation and denies that any promises were made.

Goveo-Zaragoza did not testify or offer the testimony of any other witness.

D.

Regarding, Valdez-Gonzalez, William Coker, a 24-year veteran of the United States Coast Guard, conducted the interview. Spanish is his second language, but he has many years of work experience conducted in Spanish. He considers himself fluent in Spanish, both verbally and in writing.

On March 23, 2007, he and other agents were at the DEA office. When he arrived, all the Defendants were gathered in a conference area and being advised of their right to

contact their consulate and given an idea of what would be happening that evening.  He received a packet for conducting his interview and a short briefing about the case.  The interview was accomplished in an office area that was not being occupied at that time.  He was assisted in the interview by agent Christina Amons, who does not speak Spanish.

Coker described Valdez-Gonzalez generally as being obviously nervous but in apparent good health, alert, and oriented.  Coker introduced himself and Amons and told the Defendant there were going to conduct an interview.  They discussed some biographical information with the Defendant and then he used Gov't Exh. 1 (Valdez-Gonzalez) to advise the Defendant of his rights.  Before beginning, he asked the Defendant if he could read and when Valdez-Gonzalez responded affirmatively, he had the Defendant read the form.  Coker then read each line of the form to the Defendant and offered an explanation of what it meant.  After reading each right, he then asked if the Defendant understood and if the Defendant responded affirmatively, he had the Defendant place his initials next to the right just explained.  In explaining such, the witness used "simple" terms to inform the Defendant that he did not have to tell the agent anything, but if he did it could be used against him, and before he could ask any questions, the Defendant could speak to a lawyer and he could have one present if he wished.  Finally, the witness advised that if the Defendant wanted an attorney and could not afford one, they would get one for him.  Coker testified that the Defendant acknowledged each right and indicated his understanding.  At the conclusion of all the rights, he agreed to talk to the agents.  The Defendant then checked the boxes on the waiver portion of the form and signed his name.

In Coker's view, the Defendant responded appropriately throughout.  He never asked for an attorney or for the questioning to stop.  Coker denied making any threats or promises.

Coker indicated that after the rights were read but before any questions were asked, he told Valdez-Gonzalez that generally the first person who accepts responsibility in these cases gets a lesser sentence.  The Defendant agreed to talk with the agents and the interview lasted for one and one-half hours.  At about the halfway point in the interview, the agent challenged the Defendant's version, suggesting that he did not believe him.  After a long pause and repeated urging by Coker that the Defendant needed to "tell the truth," the Defendant changed his story.

Under cross examination, the witness testified that he could not recall how the Defendant was dressed when he first met with him.  When the agent arrived, all of the Defendants were in a conference room surrounded by numerous agents.  The witness received a short briefing concerning the location of the drugs and was given a packet for the interview.  By Coker's testimony, the Defendant and others were brought to the DEA office for "interviews, prints, and photographs."  Prior to interviewing the Defendant, Coker believes that they allowed the Defendant to use the bathroom and they gave him water numerous times during the interview.  The witness believed the Defendant actually read the rights advisement form when given the opportunity to do so.  The entire interview was conducted in Spanish.  As the interview progressed, Coker would tell Amons what was said in English.  He acknowledged that the date on the form, placed there by Amons, might be inaccurate.

According to Coker, there were no threats, but at some point during the interview, he mentioned that in his experience people got eleven to thirteen years in these cases and the captain normally got more.  At some point in the interview, Amons wrote "20 years" in Spanish on a piece of paper that would have been visible to the Defendant.  The witness is uncertain why Amons did this.

15

Although the form did not specifically advise the Defendant of this fact, the witness claimed he told the Defendant that he could stop the interview any time if he wished. At the end of the interview, Coker asked the Defendant if he had anything else to tell them and when the Defendant said no, the interview ended.

The witness could not recall that the Defendant refused to answer any questions during the interview. At the point where Coker confronted the Defendant indicating he did not believe his version was true, he testified that the Defendant went quiet for a time during which Coker told him that he needed to "tell the truth" and he asked "when the boat was loaded." Finally, the Defendant responded that the boat was loaded on "Thursday," and from that point forward his story about the events changed.

Coker had no knowledge of what the Defendant experienced in the preceding week during his transport to Tampa and he made no inquiry into the matter.

The Defendant did not testify or offer the testimony of other witnesses.


II.

A.

In <u>Miranda</u>, the Supreme court held that, when an individual is in custody and subject to questioning, procedural safeguards must be employed to protect the privilege against self-incrimination. <u>Miranda</u>, 384 U.S. at 444-45. Thus, prior to any questioning, the individual must be advised of 1) his right to remain silent, 2) that anything he says can be used against him in a court of law, 3) that he has the right to the presence of an attorney, and 4) if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. <u>Id.</u> at 444. While the individual may knowingly and intelligently waive these

16

rights, unless such warnings and waiver thereof are demonstrated, no evidence obtained as a result of the interrogation may be used against the individual.  Id.

In Duckworth v. Eagan, 492 U.S. 195, 202 (1989), the Court noted that it had never insisted that Miranda warnings be given in the exact form described in the decision.  Thus, "reviewing courts therefore need not examine Miranda warnings as if construing a will or defining the terms of an easement.  The inquiry is simply whether the warnings reasonably 'convey to a suspect his rights as required by Miranda.'"  Duckworth, 492 U.S. at 203 (citing California v. Pryssek, 453 U.S. 355, 361 (1981)).  As long as the warning given the individual "touch[es] all the bases required by Miranda," the warning is sufficient.  Id.

The rights conveyed in the warning may be waived provided that the waiver is made voluntarily, knowingly, and intelligently.  Moran v. Burbine, 475 U.S. 412, 421 (1986).  For the waiver to be valid, the relinquishment of the right must have been voluntary in the sense that is was the product of a free individual choice rather than intimidation, coercion, or deception.  Id.  It also must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.  Id.  "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."  Id.  The government bears the burden of establishing a voluntary, knowing, and intelligent waiver by a preponderance of the evidence.  United States v. Farris, 77 F.3d 391, 396 (11th Cir. 1996).

### B.

Federal Rule of Criminal Procedure 5(a) states in pertinent part, "a person making an arrest outside the United States must take the defendant without unnecessary delay before a

Magistrate Judge, unless the statute provides otherwise." The purpose of the Rule is to prevent oppressive police interrogations and other "third-degree" tactics before bringing the accused in front of an officer of the court. United States v. Purvis, 768 F.2d 1237, 1238 (11th Cir. 1985). A violation of Rule 5(a) renders any evidence obtained during the illegal portion of the detention per se inadmissable without regard to proof of coercion.[4] Rogers v. United States, 330 F.2d 535, 538 (5th Cir. 1964). The burden of proving a violation of Rule 5(a) is on the defendant. See United States v. Brown, 459 F.2d 319, 324 (5th Cir. 1972). However, if there is an unreasonable period of delay, the prosecution must demonstrate that any confession provided by the defendant was provided voluntarily. Frazier v. United States, 419 F.2d 1161, 1164 (D.C. Cir. 1969).

In determining whether the government violated Rule 5(a), courts look at the reason(s) for the delay. Purvis, 768 F.2d at 1239; Rogers, 330 F.2d at 538. In Purvis, the court looked at such factors as the distance from the place of arrest to the nearest United States territory, any reasons for delay during the transport, the treatment of the defendant during transport and whether the defendant was improperly interrogated. Purvis, at 1239. In considering the "outer limits" of any necessary delay during which an interrogation will be permissible, the court in Rogers considered the availability of a committing magistrate, the length of delay before the prisoner is taken before the magistrate, and the police purpose or justification, if any, for the delay. Rogers, at 538. When a judicial officer is available and detention is prolonged for the purpose of eliciting a confession through interrogation, Rule 5(a) is violated. Id. (citing Mallory v. United States, 354 U.S. 449 (1957)).

---

[4]In Bonner v. City of Prichard, Alabama, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

In <u>Purvis</u>, the defendants were on a boat 350 miles from Key West when the boat was boarded and drugs were found.  <u>Purvis</u>, 768 F. at 1239.  Five days elapsed from the time the defendants were arrested at sea to the time they were brought before a federal magistrate.  <u>Id.</u> at 1238-39.  In concluding there was no unnecessary delay under Rule 5, the court determined that a large part of the delay was necessitated by the fact that the arrests were made at a significant distance from port and a portion of the delay was necessitated by the brief unavailability of the magistrate.  <u>Id.</u>  Additionally, the court noted that the defendants had not been mistreated during the delay, they were fed regularly, given mattresses to sleep on, and had access to bathrooms.  <u>Id.</u>  Further, there was no evidence of any improper or coercive interrogations; rather, the defendants were read their rights and interrogated by Coast Guard authorities after the arrest.  <u>Id.</u>

A similar result was reached in <u>United States v. Odom</u>, 526 F.2d 339 (5th Cir. 1976).  There, the defendant was arrested on board a vessel and not brought before a magistrate judge until four days later.  <u>Id.</u> at 341.  Because he was interrogated, post <u>Miranda</u>, and gave a statement to a DEA agent, the defendant later contended he was unreasonably detained in order to facilitate the further investigation by the DEA in violation of <u>Mallory</u>.  <u>Odom</u>, 526 F.3d at 342.  In considering the circumstances of the case, the court concluded there was no unnecessary delay because the defendant was arrested 200 miles from the nearest American territory, it was difficult if not impossible to fly him to an American port rather than transporting him by vessel, and he was presented before a magistrate judge immediately after the ship arrived in Tampa.  <u>Id.</u> at 343.

C.

In <u>Gernstein v. Pugh</u>, 420 U.S. 103, 125 (1975), the Court held that the Fourth

Amendment requires a prompt judicial determination of probable cause as a prerequisite to an

extended pretrial detention following a warrantless arrest.  In addressing what is prompt under

<u>Gernstein</u>, the Court subsequently held "that a jurisdiction that provides judicial

determinations of probable cause within 48 hours of arrest will, as a general matter, comply

with the promptness requirement of <u>Gerstein</u>." <u>McLaughlin</u>, 500 U.S. at 56.  A probable

cause determination made within 48 hours may nonetheless violate <u>Gernstein</u> if the arrested

individual demonstrates that the determination was delayed unreasonably.  <u>Id.</u>  Unreasonable

delays include those for the purpose of gathering additional evidence to justify the arrest,

motivated by ill will against the arrested individual, or simply for the sake of delay.  <u>Id.</u>

However, in considering whether the delay in a particular case is unreasonable, courts must

allow a substantial degree of flexibility.  <u>Id.</u>  Thus, courts should not ignore unavoidable

delays in transporting arrested persons from one facility to another, handling late night

bookings where no magistrate is readily available, obtaining the presence of an arresting

officer who may be busy on other matters, and other practical realities.  <u>Id.</u> at 56-57.  Where

the probable cause determination is not made within 48 hours, however, the calculus changes:

> In such a case, the arrested individual does not bear the
> burden of proving an unreasonable delay.  Rather the burden
> shifts to the government to demonstrate the existence of a
> bonafide emergency or other extraordinary circumstance.
> The fact that in a particular case it may take longer than 48
> hours to consolidate pretrial proceedings does not qualify as
> an extraordinary circumstance.  Nor, for that matter, do
> intervening weekends.

<u>Id.</u> at 57.

Whether or not foreign nationals arrested on foreign vessels in international waters may claim the benefit of this law is questionable.  In <u>United States v. Verdugo-Urquidez</u>, 494 U.S. 259, 271-72 (1990), the Court concluded that the text and history of the Fourth Amendment, as well as prior case law, dictated a holding that the Fourth Amendment did not apply to a search conducted in Mexico upon a Mexican citizen with no voluntary attachment to the United States.  More recently, the First Circuit, citing <u>Verdugo-Urquidez</u>, held that the Fourth Amendment was not implicated where a search and seizure of non-resident aliens was effected by the United States Coast Guard on a ship located in international waters.  <u>United States v. Bravo</u>, __ F.3d __, 2007 WL 1532624, *5 (1st Cir. 2007).

III.

A.

As for the alleged <u>Miranda</u> violations, the testimony supports the following findings and conclusions.  The Defendants, Mexican citizens, were arrested on board a foreign-flagged vessel on March 17, 2007, while traveling in international waters.  Thereafter, until they were flown to Tampa, they were held on the boat under conditions that likely made sleep difficult.  On March 22, 2007, they were flown into Tampa, Florida, arriving at approximately 8:00 p.m.  They were transported to the local DEA office for interviews, fingerprinting, and photographs.  Prior to the commencement of these interviews, each of the Defendants was read, in Spanish, the rights as they are set forth on the DEA-13 form.  The proper translation of the rights as set forth on that form is as provided by Pedro Marino.  As so translated, the rights given touch on all of the bases required by <u>Miranda</u>.  While it is accurate that the rights forms employed here did not expressly say that a "defense" attorney would be appointed or

21

that the attorney would be "without cost" or would be "free," it did adequately convey the fact that each Defendant could have an attorney appointed to assist him before any questioning even if he could not pay for one.

It is worth noting that the agents' testimony is essentially unrefuted concerning their use of the rights form to administer the <u>Miranda</u> warnings to each Defendant.  As for Camacho Maldonada, Goveo-Zaragoza, and Valdez-Gonzalez, there is nothing to contradict the agents' testimony that each was read his rights and each acknowledged his understanding of them before any questioning began.[5]  While Lizarraga-Caceres testified, he did not deny that he was advised of the rights on the form, and while he suggests that he did not know he could have had an attorney present and would have liked one to be present, I find this less than fully credible.

I conclude that the <u>Miranda</u> warnings were properly given prior to any interrogation and, as given, were adequate to satisfy the requirements of <u>Miranda</u>.  Thereafter, each of the Defendants evidenced his understanding of the <u>Miranda</u> rights and agreed to speak with the agents.

The waiver issue is slightly more problematic.  As stated above, the initial inquiry on the adequacy of the waiver requires consideration of whether the individual relinquished his rights voluntarily in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.  <u>See</u> <u>Moran</u>, 475 U.S. at 421.  Here, there is no evidence of intimidation beyond that inherent in this setting and Lizarraga-Caceres's claim

---

[5]General testimony that the individuals brought into this district on such "boat cases" are foreign nationals who typically do not speak English and who have little, if any, knowledge or understanding of U.S. laws, and typically are scared, while undoubtedly accurate, does not dictate a finding that such persons in an individual case are incapable of understanding the rights guaranteed by <u>Miranda</u>.

that Agent Beal spoke to him in a loud voice (during the interview).  In my view, there was not such intimidation in this case as would render the waivers involuntary.  Nor does the evidence support a finding that any Defendant was deceived into waiving his rights.

There were, however, comments made to three of the Defendants that permit them to claim some degree of coercion.  In the case of Camacho Maldonado, he was told by Almaguer that it would benefit him to cooperate with the government and tell them what happened that lead to the arrest.  As for Valdez-Gonzalez, while Coker denied making any promises or threats, he testified that he did say that the first person who accepts responsibility in these cases generally gets a lesser sentence.  He testified further that at some point he would have specifically mentioned that, in his experience, people got eleven to thirteen years in these cases and the captain normally got more.  He also acknowledged that agent Amons wrote "20 years" in Spanish on a sheet of paper that the Defendant could see.  In the case of Lizarraga-Caceres, Caraballo told him that those who cooperate are able to get better deals in the sense that his cooperation would be viewed as a positive step.  This statement was made before the Defendant was advised of his rights.  Lizarraga-Caceres testified that he was sleep deprived going into the interview by reason of his exposure to the weather during his transport while tied to the deck of the boat.  He also claimed he was denied water.  By his account, he was told he had to cooperate, and if he did so, he would be free soon, and he was also threatened that he would be put away for twenty years due to the amount of drugs seized and asked if he did not love his family.

As for Camacho Maldonado and Valdez-Gonzalez, these additional comments by the agents are clearly insufficient to render their waiver coerced.  See Bradley v. Nagle, 212 F.3d 559, 566 (11th Cir. 2000) (suggesting that cooperation would result in speedier release did not

constitute sufficient police overreaching or coercion to invalidate defendant's waiver of Miranda rights.); United States v. Broussard, 80 F.3d 1025, 1034 (5th Cir. 1996) (promising leniency in exchange for cooperation did not render waiver invalid). The statement by Caraballo prior to giving the warnings, i.e., about Lizarraga-Caceres's cooperation, would not call for a different conclusion. Nor would the fact that he was told he might get twenty years. See United States v. Okafor, 285 F.3d 842, 847 (9th Cir. 2002) (advising of potential sentence and benefits of cooperation did not render waiver invalid.) The additional statements, i.e., that if he cooperated, he would be home soon, and the reference to his family and bringing them to the United States to protect them as an inducement to get him to talk, are more significant. However, it is not at all clear when these statements were made or if they were made to induce the waiver of his Miranda rights. In any event, considering all the evidence, I find it doubtful that Caraballo would have suggested that the Defendant would be home soon if he cooperated or that he promised to bring the Defendant's family to the United States so that they would be protected. Stated otherwise, Caraballo's testimony strikes me as more credible than the testimony of the Defendant. Reference to one's family as an inducement to getting one to talk is a dangerous tactic. See Lynumn v. Illinois, 372 U.S. 528 (1963). While the question concerning his love for his family was clearly targeted at convincing the Defendant to cooperate, it was neither threatening nor a promise and falls short of establishing coercion. See United States v. Alvarez, 142 F.3d 1243 (10th Cir. 1998). Finally, as for Goveo-Zaragoza, there is simply no evidence of any improper threats or inducements.

In conclusion, I find the waivers voluntarily, knowingly and intelligently made.[6]

---

[6]It is likely correct that the Defendants were able to get little sleep while they were held on the M/V Gatun. By the evidence before me, they were not given berths but instead held on one of the decks. However, beyond this, there is little other evidence of their

B.

As for Defendants' claim that their rights under Rule 5 were significantly violated through the unnecessary delay in bringing them into this district, as set forth below, only one aspect of the claim in this case is truly troubling.  Here, contrary to any suggestion otherwise, the facts reveal a relatively swift delivery of the Defendants from the location of their arrest in the Eastern Pacific to Tampa, Florida.  The government's recitation in its responses to these motions fairly establishes why the Defendants were not here sooner, and since none of the Defendants suggest any circumstances calling into question the veracity of the government's explanation in this case, it is accepted as correct and accurate.  By this account, the Defendants were arrested a considerable distance from Tampa and a stop over in Panama during the return was necessary.  On this record, I can find no intentional delay in bringing the Defendants to Tampa.  Furthermore, while the Defendants allege harsh treatment through exposure and lack of sleep during the journey, this is not at all well developed by the evidence at the hearings.  While it seems reasonable to conclude that they were uncomfortable while being held on the vessel, there is simply an insufficient showing that they were otherwise mistreated or deprived of food or water.  And, while they were on the vessel in this condition, there was no effort to interrogate them.  These conclusions militate against a finding that Rule 5(a) was violated.

The Defendants also complain that they were unnecessarily delayed in being brought before a magistrate judge once they arrived in Tampa.  This is not an insignificant point, for as set forth above, when a judge is available and detention is prolonged for the purpose of

---

treatment and no adequate showing that the waiver and any statements were coerced because of their physical condition or level of alertness.

eliciting a confession through interrogation, Rule 5(a) is violated.  Here, it is very apparent that the agents took advantage of the nighttime arrival of these Defendants to conduct interrogations[7] before bringing them before the duty magistrate judge the following day.  Had a magistrate judge been available to conduct Rule 5(a) proceedings upon their arrival, this process would likely violate Rule 5.  However, in this district, while at least one magistrate judge is on call at all times, as a practical matter one is not available to conduct an appropriate Rule 5(a) proceeding after the court has adjourned for the evening.  Such proceedings in these type cases involve numerous security considerations, a time-consuming effort to find a sufficient number of counsel so that each Defendant is represented at the proceeding, and a sufficient number of interpreters to make the proceedings meaningful.  Given the practicalities involved, the magistrate judge is unavailable in these circumstances until the following morning when court reconvenes.

Given the evidence presented, I cannot find a violation of Rule 5(a).

## C.

As for the claim that the Defendants' Fourth Amendment rights were violated because there was no prompt judicial determination of probable cause for their arrests, I find it unnecessary to address the legal and constitutional issues raised by the argument.  Here, even assuming <u>Gerstein</u> and <u>McLaughlin</u> offer some benefit to the Defendants, given my findings that the government did not unnecessarily delay in bringing the Defendants before

---

[7]Clearly, interrogation of these Defendants was the first order of business on the government's agenda once they arrived in Tampa.  The record shows the effort was well coordinated and purposeful, as one of the agents testified they were there at the DEA office to "interview, fingerprint and photograph."  Whether the arrival into Tampa was planned to occur after the adjournment of the court for the day is unknown.  Were it shown to be intentional, a different conclusion might result.

the court and given that the government moved expeditiously in obtaining an indictment of these Defendants, there was no unreasonable delay in obtaining a probable cause determination.[8]

IV.

For the reasons set forth above, the Defendants' motions to suppress should be denied. Accordingly, it is so recommended.

Respectfully submitted on this
8th day of June 2007.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## **NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its service may constitute a waiver of the issues raised herein and shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge. 28 U.S.C. § 636(b)(1); M.D. Fla. R. 6.02.

Copies furnished to:
The Honorable Steven D. Merryday, United States District Judge
Joe Ruddy, Assistant U.S. Attorney
Counsel for Defendants

---

[8]In any event, this claim is likely foreclosed by <u>Bravo</u> and <u>Verdugo-Urquidez</u>.